ABBY EIBEL, as Administrator of the Estate of )
Ronald Eibel, Deceased, and on behalf of )
Decedent's children, Samara Y. Eibel and )
Alanna Eibel, )
                              )
        **Plaintiffs,** )
                              )
**v.** )      **No. 2:10-128**
                              )      **Judge Sharp**
W.B. MELTON, Individually and Officially as )
SHERIFF OF OVERTON COUNTY, )
TENNESSEE; DEREK SIDWELL, Individually )
and Officially as an employee of the Overton )
County Sheriff's Department; JOHN MACKIE, )
Individually and Officially as an employee of the )
Overton County Sheriff's Department; )
MICHAEL THARP, Individually and )
Officially as an employee of the Overton )
County Sheriff's Department; ROBERT )
GARRETT, Individually and Officially as an )
employee of the Overton County Sheriff's )
Department; JOHN GARRETT, Individually )
and Officially as an employee of the Overton )
County Sheriff's Department, )
                              )
        **Defendants.** )

## MEMORANDUM

This is an action by the wife of Ronald Eibel, who was fatally shot by deputies of the

Overton County Sheriff's Department. Pending before the Court are fully briefed cross-motions for

summary judgment. (Docket Nos. 22 & 27). The Court heard oral argument on those motions on

August 6, 2012, after which supplemental briefs were filed. For the reasons that follow, Plaintiff's

Motion for Summary Judgment (Docket No. 22) will be denied, while Defendants' Motion for

Summary Judgment (Docket No. 27) will be granted in part and denied in part.

1

# I. <u>FACTUAL BACKGROUND</u>

On December 31, 2009, Ronald Eibel, and his wife, Abby Eibel, went to a New Year's Eve party at the home of Ursula and William Paterna who lived approximately one mile away from the Eibel's residence. While at the party, Mr. Eibel became heavily intoxicated. Mrs. Eibel also drank at the party, consuming at least two shots of tequila.[1]

Prior to leaving the party at approximately 8:45 p.m., Mr. Eibel commented that he did not like Joe Calvette, and that "he was tired of all of this back and forth, he wished it would stop and he probably should just go beat him up."[2] The comment was made in the context of a continuing conflict between Mr. Eibel and Mr. Calvette.

Upon arriving home, Mr. Eibel, exited the car and walked toward the road, telling his wife he was "going to beat Joe up," because he was "tired of this," and wanted "to make him pee his pants." While walking down the road to the Calvette's residence, a car approached, and the driver stopped to see if Mr. Eibel needed assistance. Mr. Eibel then had a brief conversation with the occupants of the vehicle about Mr. Calvette.

Meanwhile, Mrs. Eibel got in her car and drove down the road in an effort to find her husband. Upon locating him, she convinced him to get into the car, and the pair returned home. Mrs. Eibel assisted Mr. Eibel into bed at approximately 9:00 p.m. Mrs. Eibel retired approximately an hour and a half later.

At 9:02 p.m., 911 dispatch received a call from the Calvette's residence. The caller reported that a motorist had seen Mr. Eibel walking down the road, armed and intoxicated, and claiming to

---

[1] Earlier in the evening she had also consumed alcohol, and, that morning, had taken her prescribed Cymbalta for depression, Librium for anxiety, and Adderall for ADHD.

[2] The Eibels and the Calvettes live approximately one mile from one another.

be going to the Calvette's home. At 9:18 p.m., Sergeant Robert Garrett of the Overton County Sheriff's Department was dispatched to go to the area of East Fork Land and Peach Stone Lane to investigate, and was told by dispatch that Mr. Eibel was armed and making verbal threats against Mr. Calvette.[3] Four minutes later, a second call was made to 911 dispatchers, reporting that Mr. Eibel had stated "he was out for blood," he was going to Calvette's home, and that he was carrying a pistol.

Sgt. Garrett arrived at the Calvette's residence at 9:54 p.m. There he found Mr. Calvette, his girlfriend, April Norrod, and four others. Several of those present informed Sgt. Garrett that they had been in a truck, and had seen Mr. Eibel staggering down the road, bleeding from the mouth. Upon stopping to see if they could help, the occupants of the vehicle were asked by Mr. Eibel if they knew of Mr. Calvette's location. They told him they did not, and were instructed by Mr. Eibel to tell Mr. Calvette that he was looking for him. Additionally, Mr. Calvette and his girlfriend told Sgt. Garrett that Mr. Eibel had threatened them both in the past. Ms. Norrod also reported that Mr. Eibel took lithium for a mental condition,[4] and that she heard Mr. Eibel had assaulted a co-worker because he had called him Ronald, instead of Ron.

With this information, Sgt. Garrett called Judicial Commissioner John Alcorn to see if he thought that Mr. Calvette had enough information to obtain a warrant against Mr. Eibel. Commissioner Alcorn responded that he believed Mr. Calvette did, but that he wanted at least two witnesses from the truck to accompany Mr. Calvette to swear out the warrant. All six occupants at

---

[3] While Plaintiff does not dispute this is what Sgt. Garrett was told, they do dispute that Mr. Eibel was armed.

[4] Mr. Eibel suffered from post-traumatic stress disorder, which manifested itself in the way of anxiety and irritability.

the Calvette residence went to the Overton County Sheriff's Department to obtain a warrant for Mr. Eibel's arrest.

Sgt. Garrett, joined by Overton County Deputy Derek Sidwell who had arrived on scene, remained in the area to see if they could locate Mr. Eibel. Commissioner Alcorn approved a warrant for the arrest of Mr. Eibel for aggravated stalking.

Unable to locate Mr. Eibel, Sgt. Garrett contacted Sheriff W.B. Melton to advise him of the situation, and to request that the Critical Response Unit ("CRU")[5] be activated to serve the arrest warrant. Sheriff Melton advised that CRU members who were then on duty could assist in serving the warrant.

Sheriff Melton, Sgt. Garrett, Chief Deputy John Garrett, and Deputies Sidwell, Michael Tharp, John Mackie, and Stephen Castle met at the intersection of East Fork Road and Peach Stone Lane to develop a plan to serve the warrant. During the meeting, it was decided that Chief Deputy Garrett would lead the entry and hold a ballistic shield to protect the deputies from any possible fire from the residence. The order of entry was then as follows: Deputy Sidwell, Deputy Mackie, Deputy Tharp, Sgt. Garrett, and Chief Deputy Garrett. Sheriff Melton and Deputy Castle were tasked with securing the back and exterior of the home.

Early in the morning on January 1, 2010, officers approached the Eibel residence.[6] In response to a knock, Mrs. Eibel opened the door,[7] was asked if Mr. Eibel was home, and was told

---

[5] The CRU is Overton County's equivalent to a SWAT, CERT or SERT team.

[6] The blue overhead lights of the police vehicles were on, but it is unclear whether anyone in the home could see the lights.

[7] There was a light on the porch over the door. It was turned on either because the approaching officers triggered the motion sensor, or because Mrs. Eibel flipped the switch when she answered the door.

4

that the officers were there to serve a felony arrest warrant on Mr. Eibel.

Mrs. Eibel informed the officers that her husband was asleep, and asked if she could go wake him. Sgt. Garrett told her no, the CRU needed to go in and get him. Ms. Eibel then stepped back from the door, headed towards the kitchen at the back of the house, and gestured to the bedroom immediately to the right of the front door where Mr. Eibel was sleeping.

The bedroom contained a bed that ran parallel to the doorway. At the top of the bed was an attached headboard containing shelves and drawers. In the headboard, Mr. Eibel kept a loaded 9 millimeter Makarov handgun. At the end of the bed was a chest upon that contained two baskets of clothes. On each side of the bed were night stands. A closet was located to the left of the bed, and to the left of that was a chest of drawers with a mirror. On the right side of the doorway to the bedroom, stood a large gun cabinet.

The CRU officers entered the bedroom, but did not turn on the lights. They were, however, carrying flashlights.[8] Deputy Sidwell entered first, followed by Deputy Mackie, Deputy Tharp, Sgt. Garrett, and Chief Deputy Garrett.[9] What transpired in the bedroom is something that the parties hotly dispute. Briefly summarized, the accounts of the officers present in the room show the following:

• In an incident report filed shortly after the shooting, Deputy Sidwell reported that Mr. Eibel was shot after he reached into the headboard, swung around with a handgun, and fired it in Deputy Mackie's direction. This turned out not to be the case, as Mr. Eibel never fired a weapon, and Deputy Sidwell conceded as much in

_____

[8] The parties dispute whether these were conventional flashlights, or high intensity flashlights designed to temporarily affect sight.

[9] The order of entry changed slightly from the original plan because the ballistic shield carried by Chief Deputy Garrett did not fit through the door.

5

his deposition.[10]  Deputy Sidwell also stated in his deposition that, as the group proceeded in, he shouted out "Sheriff's Department" at least three times.  Upon entering the room, he saw Mr. Eibel reaching into the headboard and "swing out" a handgun, prompting Deputy Sidwell to yell, "he has a weapon."  It was at this point that Deputy Sidwell thought Mr. Eibel had fired, and Deputy Mackie responded with two shots in rapid succession.  (Incident Report, Docket No. 31-5 & Docket No. 32-2 Sidwell Depo. at 112-114).

• Deputy Mackie filed an incident report in which he stated that he opened fire after hearing a shot fired.  This occurred, he claimed, after he followed Deputy Sidwell into the bedroom.  According to Deputy Mackie, he was standing to the left of the bed when he saw Mr. Eibel reach into the headboard and yelled,  "don't do it."  Mr. Eibel disregarded the command, pointed his gun, and fired a round, leaving Mackie with no choice but to return fire.  Deputy Mackie also claims that he was required to shoot Mr. Eibel a second time when Mr. Eibel again raised is gun.  In his deposition, Deputy Mackie claimed that, after he followed Deputy Sidwell into the room, he observed Mr. Eibel roll to his left, reach into the headboard, and retrieve a gun.  Deputy Mackie claims that he next told Mr. Eibel, "don't do that," or words to that effect, and stated that once Mr. Eibel had the gun in his hand he could not have surrendered because "he was drawing down on us."  Later in the same deposition, Mackie testified that he shot Mr. Eibel as he was "in the process of coming around" with the handgun.  (Incident Report, Docket No. 31-4 & Docket No. 32-1, Mackie Depo. at 138-147).

• In the incident report prepared by Deputy Tharp after the shooting, he reported that, upon entering the bedroom, he heard Deputy Sidwell yell out that the suspect was going for a gun and that he saw, with the aid of his flashlight, the suspect roll on his back with a handgun in his hand.  At that time, Deputy Tharp turned off his flashlight and saw a muzzle flash coming from the area of the center of the bed, whereupon he ducked down and heard another shot fired.  In his deposition, Deputy Tharp recalled that, upon entering the room, he saw Mr. Eibel roll onto his back with a gun in his hand, and that "Deputy Sidwell had done tried to get on the bed to fight with him over the gun."  (Incident Report, Docket No. 31-6; Docket No. 60-4, Tharp Depo. at 97 & 106).

• Sgt. Garrett's incident report indicates that, almost immediately upon entering the residence, he heard, Deputies Sidwell and Mackie yell "he has a gun," while all of the officers were announcing their presence.  When he entered the bedroom, Sgt. Garrett heard a shot ring out, and Deputy Sidwell struggling with Mr. Eibel for control of the gun.  After hearing two more shots, Sgt. Garrett joined Deputy Sidwell

_____

[10]  As Defendants point out, it may be that Sidwell was initially confused because there was a mirror in the headboard and what he actually saw may have been the reflection of Mackie's muzzle blast.

6

on the bed in an effort to wrest the gun away and handcuff Mr. Eibel. In his deposition, Sgt. Garrett testified that three shots were fired in rapid succession, that he entered the bedroom as the last shot was fired, and that he jumped on the bed in an effort to subdue Mr. Eibel. (Incident Report, Docket No. 31-3; Docket No. 32 Sgt. Garrett Depo. at 89-92).

• Finally, Deputy Chief Garrett stated in his incident report that when the officers went into the room, they announced themselves. As he heard Deputy Sidwell announce that the "subject had a gun," he entered the room and saw a muzzle flash coming from "near the center of the room" which was shortly followed by two other shots coming from his right side. He then observed Deputy Sidwell and Sgt. Garrett on the bed in a physical struggle with Mr. Eibel and heard Mr. Eibel complaint that "he had not even got a round off at us, even though he fired at least one shot at us." (Docket No. 31-3).

After hearing gunshots, Mrs. Eibel entered the room and observed a deputy attempting to place handcuffs on Mr. Eibel. Upon noticing Mrs. Eibel in the room, officers asked why she was there. She motioned towards her side of the headboard, and informed officers that there was a second gun in the room. Mrs. Eibel was instructed to leave the room, and she went back to the kitchen. Mackie then secured the second weapon. Deputy Castle at some point went into the kitchen and informed Mrs. Eibel that she would have to be handcuffed. Deputy Castle remained with her in the kitchen where she sat handcuffed at the table.

At 1:11 a.m., Sgt. Garrett called the Emergency Medical Service ("EMS"), reporting that an individual had a gunshot wound to the chest. EMTs arrived within four to five minutes and transported Mr. Eibel to the hospital, leaving the residence at 1:34 a.m. Upon arrival at the hospital at 2:10 a.m., Mr. Eibel was pronounced dead.

Based upon the foregoing events, Mrs. Eibel filed suit as the administrator of the estate of Mr. Eibel, and on behalf of his children Samara and Alanna Eibel. Plaintiff brings claims for "federal constitutional violations" against all Defendants pursuant to 42 U.S.C. § 1983 for alleged

violations of the Fourth and Fourteenth Amendments to the United States Constitution, as well as claims for negligence in the death of her husband and as a result of her being handcuffed.  She seeks both compensatory and punitive damages.

## II.  <u>STANDARD OF REVIEW</u>

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation."  <u>Ferro Corp. v. Cookson Group, PLC</u>, 585 F.3d 946, 949 (6th Cir. 2009). A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000).   A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## III.  <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

At oral argument, the Court informed Plaintiff that her Motion for Summary Judgment would be denied because, while the Motion purports to seek summary judgment on the issue of liability, the Memorandum in support thereof  fails to establish the non-existence of questions of material fact.  Instead, the Memorandum is directed to the issue of how the Court should analyze Plaintiff's claims.  Indeed, Plaintiff frames  "the question" to be decided as "whether the actions of police officers prior to the actual committing of excessive force, or seizure, should be considered in the application of the reasonable police officer standard of excessive force."  (Docket No. 23 at 9).

Even a favorable answer to the question presented by Plaintiff (which the Court does not

give, see, Sec. IV(B) below) would not establish that any of the Defendants are liable to Plaintiff on any of the claims presented.  Accordingly, Plaintiff's Motion for Summary Judgment will be denied.

## IV.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Prior to discussing the substance of Defendants' Motion for Summary Judgment, the Court first discusses two topics which directly bear on how the motion (and this case) is to analyzed. Those topics include (1) whether the Fourteenth or Fourth Amendment applies to Plaintiff's unlawful seizure/excessive force claims, and (2) whether all of the events which preceded the shooting of Mr. Eibel should be taken into account in assessing whether he was subjected to excessive force.

### A.  Fourth Versus Fourteenth Amendment

The parties dispute whether Plaintiff's excessive force and search and seizure clams are properly analyzed solely under the Fourth Amendment, or under the Fourteenth Amendment as well. "This is not a purely academic question as the standards of liability vary significantly according to which amendment applies."  Lanman v. Hinson, 529 F.3d 673, 679 (6th Cir. 2008).

In support of her position that the search and seizure claims are also properly analyzed under the Fourteenth Amendment, Plaintiff relies exclusively on Lanman.  However, reliance on that case is misplaced because it involved a wrongful death claim brought by the estate of an individual who had been admitted to a psychiatric hospital.  During the course of its discussion, the Sixth Circuit wrote:

> We have held that "[w]hich amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between." . . .  If the plaintiff was a convicted prisoner at the time of the incident, then the Eighth Amendment deliberate indifference standard sets the standard for an excessive force claim. . . . *But if the plaintiff was a free person, and the use of force occurred in the course of an arrest or other seizure, then the plaintiff's claim arises*

9

*under the Fourth Amendment and its reasonableness standard*. . . . Thus, the Fourth
Amendment reasonableness standard generally applies any time a government
official seizes a free citizen with the purpose of potentially creating an involuntary
custodial relationship with the State.

Id. at 680.

The foregoing passage only underscores what the Supreme Court stated more than a quarter

of a century ago: "Whenever an officer restrains the freedom of a person to walk away, he has seized

that person" for purposes of the Fourth Amendment, and "there can be no question that apprehension

by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth

Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985). Accordingly, the Court analyzes

Plaintiff's excessive force and search and seizure claims under the Fourth Amendment.[11]

## B. The Segmenting Rule

In excessive and deadly force cases, the Sixth Circuit generally applies a "temporally

segmented analysis to the possible erroneous actions taken by police officers." See, Chappell v. City

of Cleveland, 585 F.3d 901, 914 (6th Cir. Cir. 2009). Commonly referred to as the "segmenting

rule" or "segmenting approach," and first adopted in Dickerson v. McClellan, 101 F.3d 1151 (6th Cir.

1996), the Sixth Circuit "embrace[s] a somewhat narrow interpretation of the Supreme Court's

mandate that courts look to the totality of the circumstances in determining if excessive force is

used." Claybrook v. Birchwell, 275 F.3d 1098, 1103 (6th Cir. 2001).

Under the segmenting rule, a court is to "'carve up' the events surrounding the challenged

police action and evaluate the reasonableness of the force by looking only at the moments

---

[11] This ruling does not apply to Plaintiff's failure to provide adequate medical care claim, since the
Due Process Clause of the Fourteenth Amendment provides the source of that right. See, DeShaney v.
Winnebago County Dept. of Soc. Serv's , 489 U.S. 189, 199 (1989) ( noting that the Due Process Clause
requires the government to provide medical care to suspects in police custody who have been injured while
being apprehended by the police).

10

immediately preceding the officer's use of force," an approach that "applies even to encounters lasting very short periods of time." Greathouse v. Couch, 433 Fed. App'x 370, 372 (6th Cir. 2011). The rationale behind the rule has been explained as follows:

> "The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing."

Dickerson, 101 F.3d at 1161 (quoting Plakas v. Drinski, 19 F.3d 1143, 1150 (7th Cir.1994)).

Notwithstanding that the segmenting rule is clearly entrenched as the general rule in the Sixth Circuit, Plaintiff asks that it not be employed in this case. In support, Plaintiff relies on Bletz v. Gribble, 641 F.3d 743, 752 (6th Cir. 2011) and its citation to Claybrook, 274 F.3d at 1103-04 and Livermore ex rel. Rohm v. Lubelan, 476 F.3d 397, 406 (6th Cir. 2011) for the propositions (respectively) that (1) the "time frame is a crucial aspect of excessive force cases, but where the events preceding the shooting occurred in close temporal proximity to the shooting, those events have been considered in analyzing whether excessive force was used"; and (2) "[w]hether events leading up to a shooting are legitimate factors to consider in assessing an excessive force claim depend on the totality of the circumstances in question." (Docket No. 51 at 2 & 3).

While the Sixth Circuit in Bletz did, in fact, make both observations, that case is inapposite. In Bletz, the court specifically stated that it "need not decide precisely which preceding events (i.e. the breadth of the excessive-force) should properly be considered in analyzing the reasonableness of [the defendant's] use of deadly force" because it could "instead affirm the district court's denial of qualified immunity by looking only at the facts alleged by plaintiff in the moment immediately

preceding the shooting." <u>Bletz</u>, 641 F.3d at 752. As for <u>Bletz</u>'s citation to <u>Claybrook</u> and <u>Livermore</u>, those cases actually support application of the segmenting rule in this case.

<u>Claybrook</u> involved an action brought by the administrator of plaintiff's estate, who had been fatally shot by undercover police officers during a confrontation that occurred while he was guarding a market (that doubled as a front for a gambling operation) in which his daughter-in-law worked. Undercover officers first observed plaintiff's decedent standing in the dimly lit parking lot of the market, holding a shotgun. Suspecting that a robbery was in progress, officers radioed for backup, drove onto the lot, and confronted plaintiff's decedent. After the officers and plaintiff's decedent instructed each other to drop their weapons, a volley of gunfire ensued, injuring a police officer who reported to dispatch that shots had been fired. At about the same time, plaintiff's decedent circled behind the market in an attempt to ambush the officers, positioned himself behind a concrete structure, and aimed his shotgun at the officers who had pursued him. After plaintiff's decedent refused to drop the shotgun, the officers fired, killing him.

On appeal from the denial of their motion for summary judgment, the officers argued that the only relevant events to consider in determining whether deadly force was reasonable was the final confrontation, where the plaintiff's decedent fled behind the market, hid behind the concrete structure, and the second shootout began, because it was during this "segment" of events that plaintiff was shot and killed. Noting that "the plaintiffs brought suit to contest all use of deadly force against their deceased father, not only the shot that took his life," the Sixth Circuit rejected the officers' argument, writing:

> We simply disagree with their contention that the initial exchange of bullets should not weigh upon our analysis. Under the precedent of <u>Dickerson</u> and <u>Boyd</u> [v. Baeppler, 215 F.3d 594 (6th Cir. 2000)], we instead conclude that the evening's events are properly viewed in three segments: first, the officers' approach and

confrontation of [plaintiff decedent]; second, the initial firefight taking place in front of the market; and third, the shots fired after [plaintiff decedent's] move to a position behind the concrete steps. Moreover, we conclude that all events taking place in the second and third segments are material to our analysis.

Although the officers decision to approach Claybrook in the manner that they did was in clear contravention of Metro Nashville Police Department policy regarding procedures for undercover officers, under Dickerson, any unreasonableness of their actions at that point may not weigh in consideration of the use of excessive force. Dickerson, 101 F.3d at 1161–62 ( citing Drewitt v. Pratt, 999 F.2d 774, 778 (4th Cir.1993) (finding irrelevant to use of deadly force fact that officer had violated police procedure by failing to identify himself as an officer in stopping a suspect while dressed in plain clothes)).

Claybrook, 274 F.3d at 1105.

Just as it was proper in Claybrook to segment out the issue of whether the officers' approach of plaintiff's decedent violated departmental policy, it is proper here to segment out the issues of whether the warrant was properly secured and whether it was prudent or proper to utilize the Critical Response Unit to serve the warrant from the issue of whether the shooting that occurred in the bedroom was the proper use of deadly force. The pre-shooting events are not germane, and conceptually distinct from, the question of whether the officers violated Mr. Eibel's constitutional rights by the use of deadly force. See, Greathouse, 433 Fed. App'x at 373 ("we have continued to apply the segmented approach to excessive-force claims, without regard to earlier violations committed by police officers"); Dickerson, 101 F.3d at 1162 ("Although both claims are premised on Fourth Amendment violations, the violation of the knock and announce rule is conceptually distinct from the excessive force claim").

Livermore, which Bletz also cites, only bolsters this conclusion. Indeed, in regard to Livermore, the Sixth Circuit in Bletz wrote:

[T]his court analyzed an excessive-force claim in segments by "first identify[ing] the seizure at issue . . . and then examin [ing] whether the force used to effect that

13

seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." . . . The court in <u>Livermore</u> separated the actions of the defendant officer that occurred in the hours leading up to the fatal shooting from the "split-second judgments made immediately before the officer used allegedly excessive force."

<u>Bletz</u>, 641 F.3d at 751-752. Thus, the assertions in <u>Livermore</u> that a police lieutenant "acted recklessly by creating circumstances to justify shooting" plaintiff, by ordering snipers to shoot if he raised a weapon, by failing to warn him that he would be fired upon, and by "rushing the assault" were irrelevant because those actions "occurred in the hours and minutes leading up to [the] killing" and "<u>Dickerson</u> instructs courts to disregard these events." <u>Livermore</u>, 476 F.3d at 407. Just as "the preceding decision made by [the lieutenant] are immaterial," so, too, the preceding decisions by the officers in this case as to method of securing and executing the warrant are immaterial to what transpired in the bedroom. After all, "it is the reasonableness of the 'seizure' that is the issue, not the reasonableness of the [officers'] conduct in time segments leading up to the seizure," <u>Chappell</u>, 585 F.3d at 909, that serves as the essential underpinning of the segmenting rule.

Effectively, Plaintiff asks this Court to ignore sixteen years of precedent in this Circuit by not applying the segmenting rule, and, in doing so, asserts that "the Sixth Circuit is continually making exceptions" to the rule. (Docket No. 51 at 2). The Court finds that the segmenting rule is clearly applicable under the facts presented, and if a further exception is appropriate, or the segmenting rule is to be abandoned, that is a matter for the Sixth Circuit to determine.

Applying the segmenting rule, the Court considers four discrete events: (1) the securing of the warrant; (2) the decision to use the Critical Response Unit; (3) the shooting of Mr. Eibel; and (4) Defendants' post-shooting conduct action in allegedly failing to provide aid and allegedly engaging in a cover-up.

## C. **Securing the Warrant**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...." U.S. Const. amend. IV.  Probable cause is a fluid concept and requires that, prior to an arrest, the police reasonably believe that the person to be arrested has committed or is committing a crime, a determination that is made based upon the totality of the circumstances.  See, Maryland v. Pringle, 540 U.S. 366, 371 (2003); Illinois v. Gates, 462 U.S. 213, 238 (1983).  "[T]he question is 'whether at the time of the arrest, the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person to conclude than an individual had either committed or was committing an offense.'" United States v. Stewart, 315 Fed. App'x 554, 557 (6th Cir. 2009)(quoting,  United States v. Torres-Ramos, 536 F.3d 542, 555 (6th Cir. 2008)).

In moving for summary judgment, Defendants assert that there was sufficient evidence presented to Commissioner Acorn to find probable cause to arrest Mr. Eibel on the charge of aggravated stalking pursuant to Tenn. Code Ann. § 39-17-315, particularly since "great deference" is to be afforded a judicial officer's determination of the existence of probable cause.  United States v. McPhearson,, 469 F.3d 518, 524 (6th Cir. 2006).  In response, Plaintiff does not directly challenge Defendants' assertion about the existence of probable cause, but instead claims the warrant was invalid because Commissioner Alcorn was not neutral and detached, and because Mr.  Calvette was allegedly a known drug dealer and suspected thief.

"An arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983."  Voyticky v.

15

<u>Village of Timberlake</u>, 412 F.3d 669, 677 (6th Cir. 2005).  Moreover, an arrest warrant founded on

probable cause carries with it the limited authority to enter a suspect's home if there is reason to

believe the suspect is in the residence.  <u>Payton v. New York</u>, 445 U.S. 573, 603 (1980).   That said,

"[d]eference to a magistrate, however, is not boundless," and therefore, a court may make "inquiry

into the knowing or reckless falsity of the affidavit on which th[e] determination was based," and

"must also insist that the magistrate purport to perform his 'neutral and detached' function and not

serve merely as a rubber stamp for the police."  <u>United States v. Leon</u>, 468 U.S. 897, 914 (1984).

With regard to the neutrality and detachment of Commission Alcorn, Plaintiff argues:

> .  .  .  There is evidence in the record, which would suggest that Magistrate Alcorn
> was not in the habit of fulfilling the duties of his position regarding the detachment,
> and neutrality.  Specifically, Magistrate Alcorn was in the practice and habit of
> helping the officers and deputies write warrants.  In fact, the judicial commissioners
> were oft referred to as "warrant writers".  When questioned about his interaction with
> the judicial commissioners, Deputy Mackie stated that not only had he never been
> turned down for the request of a warrant, Deputy Mackie also knew of no other
> person who had ever [emphasis added] been turned down for a warrant.

(Docket No. 47 at 5, bracketed language without emphasis in original).  As for the reliability of Mr.

Calvette who was the affiant on the warrant, Plaintiff argues:

> .  .  .  Joe Calvette was, by Deputy Mackie's own admission, a drug dealer and by
> the admission of other deputies, suspected of theft.  Obviously, drug dealers have
> little to no credibility. Persons suspected of theft might even have less credibility.
> However, this person with an absolute lack of credibility or reliability was the same
> that was relied upon in obtaining the warrant for Mr. Eibel.  In addition, Mr. Eibel
> and Mr. Calvette had a history of contention, and thus the reliability and credibility
> of Mr. Calvette should have further been investigated, instead of relied upon in the
> show of force which ultimately lead to the death of Mr Eibel.

(<u>Id</u>. at 5-6).  For any number of reasons, Plaintiff's assertions are insufficient to create a genuine

issue of material fact on the issue of whether Commissioner Alcorn served as a neutral and detached

judicial officer for purposes of this case and/or whether the affidavit was based upon knowing or

reckless falsity.

First, while Plaintiff claims "there is evidence in the record," she fails to point the Court to that evidence, and even her reference to what Deputy Mackie supposedly stated in his deposition is without citation to the record. Second, even assuming that Deputy Mackie had no problems in the past in securing a warrant from Commissioner Alcorn, and knew of no other officers who had any difficulty, this is nothing but a personal opinion, does not address what happened that night, and disregards the fact that Deputy Tharp was the one who actually secured the warrant in this case. Third, if Commissioner Alcorn was in the habit of blindly signing warrants upon the mere request of officers, he certainly acted out of character in this case because the undisputed evidence is that he wanted at least two witnesses from the truck to accompany Mr. Calvette to swear out the warrant, and all six occupants at the Calvette residence went to the Overton County Sheriff's Department to obtain the warrant for Mr. Eibel's arrest. Fourth, and relatedly, assuming for the sake of argument that Mr. Calvette was a "known" drug dealer and suspected thief, this does not, perforce, make him incompetent, and, in any event, the warrant was not based upon his information alone.[12]

Even if there was some basis for Plaintiff's position that the warrant in this case was somehow defective, summary judgment is still appropriate on this claim because Defendants are entitled to qualified immunity. Qualified immunity is an affirmative defense which shields

_____

[12] In her brief, Plaintiff asserts that Article 1 § 7 the Tennessee Constitution has been construed to provide greater protection of individual rights than the Fourth Amendment because, while the Supreme Court in Illinois v. Gates, 462 U.S. 213 (1983) rejected the two-prong test developed in Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. United States, 393 U.S. 410 (1969) in favor of a "totality of the circumstances" approach, the Tennessee Supreme Court refused to do so in State v. Jacumin, 718 S.W.2d 430 (1989). Leaving aside that Gates, Aguilar, Spinelli, and Jacumin all involved anonymous or confidential sources referred to in an affidavit for a warrant, Plaintiff does not appear to plead any claims under the Tennessee Constitution. Regardless, and as already indicated, the warrant in this case was not issued solely upon Mr. Calvette's information.

17

"government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Generally, the qualified immunity inquiry involves first determining whether a constitutional violation occurred, and, if so, a subsequent determination of whether the right infringed was clearly established. Saucier v. Katz, 533 U.S. 194, 202 (2001); McKinley v. City of Mansfield, 404 F.3d 418, 429-30 (6th Cir. 2005).[13]

"In the context of arrest warrants, the Supreme Court affords officials broad qualified immunity protection." Ireland v. Tunis, 113 F.3d 1435, 1448 (6th Cir. 1997) (collecting cases). "Qualified immunity generally applies unless 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.'" Howell v. Sanders, 668 F.3d 344, 354 (6th Cir. 2012) (citation omitted).

In this case, the Court cannot say, as a matter of law, that any reasonably competent officer could have concluded that a warrant for aggravated stalking against Mr. Eibel should not have issued. According to the affidavit which served as the basis for the warrant, Mr. Eibel had (1) made several "drive bys" of Mr. Calvette's home and followed Mr. Calvette to different locations in the past in an effort to intimidate him; (2) verbally threatened Mr. Calvette and flashed a gun at the residence; (3) threatened to shoot Mr. Calvette that evening, a threat that was made to a passing

---

[13]While this sequence "is often appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 129 S.Ct. 808, 818 (2009). Instead, courts should use "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.

18

motorist at a location not far from Mr. Calvette's home; and (4) made the threat while armed with a weapon. (Docket No. 31-1).

Based upon the foregoing, the Court will grant summary judgment on Plaintiff's claim that the issuance of the arrest warrant for Mr. Eibel's arrest violated the Fourth Amendment.

## D.  Use of the CRU to Execute the Arrest Warrant

"The decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force – force far greater than that normally applied in police encounters with citizens." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1190 (10th Cir. 2002). This decision has even greater implications when the SWAT team is deployed at night. See, Bravo v. City of Santa Maria, 665 F.3d 1076, 1086 (9th Cir. 2011) ("SWAT officer's nighttime searches . . . both constitute much greater intrusions on one's privacy than ordinary daytime searches and carry a much higher risk of injury to persons and property"). Therefore, "a decision to employ a SWAT-type team can constitute excessive force if it is not 'objectively reasonable' to do so in light of the 'totality of the circumstances,'" Estate of Smith v. Marasco, 430 F.3d 140, 149 (3rd Cir. 2005) ("Marasco II"), and, hence, "the fact that the defendants had probable cause to arrest [Mr. Eibel] does not mean that they could use any amount of force in that process." Estates of Smith v. Marasco, 318 F.3d 497, 516 (3rd Cir. 2003) ("Marasco I").

In considering whether the decision to utilize a SWAT team to execute a warrant was objectively reasonable, a court can look at various factors. These include

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . . [whether] the physical force applied was of such an extent as to lead to injury . . . the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers

19

must contend at one time.

Marasco II, 430 F.3d at 150.

Defendants argue that it was reasonable to deploy the CRU because they had an arrest warrant for aggravated stalking, and they "had been advised that: 1. Mr. Eibel had a history of threatening a neighbor, Mr. Calvette, at times with a gun; 2. Mr. Eibel was reportedly very intoxicated that evening; 3. Mr. Eibel had told several witnesses in a car that he intended to harm Calvette; 4. This comment was made in close proximity to the Calvette home; 5. Mr. Eibel had driven by the Calvette home in the past while making threats; 6. Mr. Eibel had a gun that night; 7. Deputies had been told that Eibel had a temper; and 8. Deputies had been told that he was taking Lithium and had mental problems." (Docket No. 29 at 25-26). Notwithstanding that Defendants made these assertions, and despite the fact that they devoted a specific section of their supporting Memorandum to the proposition that it was objectively reasonable to utilize the CRU in this case, Plaintiff did not directly respond to this argument in her 25-page memorandum in opposition, or in any of the other filings she has made in relation to the cross-motions for summary judgment.

At oral argument, counsel asserted that Defendants could have simply called the Eibel's residence and told him to surrender or that he needed to come down to the station the next day, or they could have simply sent a couple of officers to make the arrest. While all of this may be true, it does not address the question of whether what Defendants did do was objectively unreasonable. See, McKinney v. Laird, 2012 WL 529828 at *7 (W.D. Ky. Feb. 17, 2012) (rejecting under the segmenting rule plaintiffs' criticism of the police department's action in failing to call the residence and/or failing to send detective to see if the defendant was there prior to utilizing a SWAT team).

Counsel also argued that special circumstances were presented due to the fact that some of the deputies knew Mr. Eibel suffered from a "mental condition," and, according to Deputy Mackie,

20

was "crazy." However, this actually lends support to the proposition that using the CRU to arrest Mr. Eibel was prudent, particularly since he was believed to be in possession of a firearm. See, Marasco I, 318 F.3d 516-17 (fact that "several officers knew of [the suspect's] PTSD or at least considered him unstable, and it generally was believed that [he] possessed firearms . . . tend[ed] to support the use of force" and deployment of the SWAT team).

Regardless, the Court finds that Defendants are entitled to qualified immunity on this claim, albeit not because, as Defendants argue, "[t]here have been no cases decided by the United States Supreme Court or the Sixth Circuit that clearly dictate the conduct of the CRU, under the facts confronting them, was unconstitutional." (Docket No. 42 at 29).

"The Fourth Amendment's guarantee that people shall 'be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' has been part of our Constitution since 1791," and "[a]s a general proposition, the law that a search or seizure must be objectively 'reasonable' under all the circumstances has been 'clearly established' for a long time." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1195-96 (10th Cir. 2001). Indeed, "there is no doubt that Graham v. Connor . . . clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Saucier, 121 S.Ct. at 2156; see, McKinney, 2012 WL 529828 at *7 (citation omitted) (noting that "[a]lthough the Sixth Circuit has not addressed the issue, other appellate courts have reviewed whether the use of tactical assault teams, like SWAT, in seizing a residence and effectuating a search violates the Fourth Amendment's protections").

Moreover, for a right to be "clearly established," it need not be specifically announced by the Supreme Court or the Sixth Circuit. As the Sixth Circuit has explained:

"For a right to be clearly established, the contours of the right must be sufficiently

21

clear that a reasonable official would understand that what he is doing violates that right." Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007) (citation and internal quotation marks omitted). "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." Risbridger v. Connelly, 275 F.3d 565, 569 (6th Cir.2002) (citation omitted). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). . . . A public official could "still be on notice that [his] conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

Holzemer v. City of Memphis, 621 F.3d 512, 527 (6th Cir. 2010).

In light of circuit cases such as Holland, and Marasco I & II, and also because "[w]hether the deployment of a SWAT team violates [the Fourth Amendment] arguably arise from the well-established rule 'that those who execute lawful search warrants must do so in a reasonable manner," McKinney, 2012 WL 529828 at *7, the Court finds that the law clearly required that CRU or SWAT teams not be deployed arbitrarily, and instead can be employed only when it is objectively reasonable to do so. This does not end the inquiry, however, because qualified immunity attaches, unless there has been a constitutional violation. Saucier, 533 U.S. at 202.

"To satisfy the first Saucier prong and establish a constitutional violation to defeat the officers' claim of qualified immunity, [Plaintiff] 'is obliged to present facts which if true would constitute a violation of clearly established [Fourth Amendment] law." Simmonds v. Genesee County, 682 F.3d 438, 445 (6th Cir. 2012) (quoting, Dominque v. Telb, 831 F.2d 673, 677 (6th Cir.1987). "Specifically, [s]he must 'go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted). Plaintiff has not done so in this case.

In any event, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." <u>Saucier</u>, 533 U.S. at 202. Given the paucity of the law in the area at the time of the events in question, the Court cannot find that a reasonable officer would be put on notice that the deployment of the CRU under the particular facts of this case would be clearly unlawful.

In <u>Holland</u>, which is perhaps the most-cited case involving the propriety of deploying a SWAT team, the Tenth Circuit, while finding that SWAT team members were not entitled to qualified immunity for the alleged use of excessive force, found that the decision to deploy the SWAT team was not unlawful. It did so, even though it accepted plaintiffs' characterization of the events which included that the raid involved the serving of a misdemeanor warrant, the officers knew that the subject of the warrant had no criminal record, and "knew him to be cooperative in his previous dealings with them to the point of being 'polite.'" <u>Holland</u>. 268 F.3d at 1191. The court wrote:

> Viewed most favorably to those claiming injury, the facts alleged by plaintiffs-appellees nevertheless do not show that by itself, the display of force inherent in the deployment of the SWAT team—the force invoked by the decision to deploy—was excessive under Fourth Amendment standards. Nor can it fairly be said that [the officers] lacked any plausible basis for believing that "dynamic entry" was warranted in this situation. As they had anticipated, the deputies executing the warrants encountered several persons besides [the suspect] both inside and outside the house on the . . . property, and firearms were found at the residence. There existed the possibility of an altercation, but given the SWAT team's swift action, no such incident actually occurred. In hindsight, plaintiffs argue that an altercation was highly unlikely to occur, but we are not prepared to conclude that the Sheriff's concerns prior to the April 16 raid were so unwarranted as to render "dynamic entry" by itself an excessive use of force.

<u>Id</u>.

In this case, the decision to deploy the CRU was made in the context of an arrest warrant for the felony of aggravated stalking, which, by definition "means a willful course of conduct involving

23

repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Tenn. Code Ann. § 39-17-315(a)(4). The individual accused of the aggravated stalking, Mr. Eibel, had allegedly made threats about hurting Mr. Calvette, and driven by his house while armed with a firearm in the past. On the night in question, and not long before the decision to deploy the CRU, Mr. Eibel allegedly threatened harm to Mr. Calvette in the presence of others. Given that he allegedly made the threat while armed with a pistol, it was reasonable to assume that Mr. Eibel was armed, or had access to a firearm in his house. Adding to the uncertainty of the situation, Mr. Eibel had been drinking heavily, was believed to have a mental condition, and was thought by at least one officer involved to have been "crazy." Under these circumstances, the Court simply cannot conclude that a reasonable officer would be on notice that the deployment of the CRU to apprehend Mr. Eibel was clearly unlawful.

Accordingly, summary judgment will be granted on Plaintiff's Fourth Amendment claim for unlawful search or seizure based upon the use of the Critical Response Unit to execute the arrest warrant.

## E.  Excessive Force in the Execution of the Warrant[14]

---

[14] It is unclear whether Plaintiff's excessive force claim encompasses only the shooting of Mr. Eibel, or also the allegation that "plaintiff's wrists were hurting because the handcuffs were put on too tight[.]" (Docket No. 1, Complaint ¶ 77). If Plaintiff is raising an excessive force claim based upon the handcuffing, the same will be dismissed, because "[n]ot all allegations of tight handcuffing . . . amount to excessive force." Fettes v. Hendershot, 375 Fed. Appx. 528, 533 (6th Cir. 2010). "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: '(1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing.'" Id. (quoting, Martin v. Heiderman, 106 F.3d 1308, 1313 (6th Cir. 1997)). Plaintiff has not directed the Court to any such evidence in this case.

24

Because Plaintiff claims that Defendants used excessive force, "the relevant question is whether the officers' use of force complied with that allowable under the Fourth Amendment." Simmonds, 682 F.3d at 444. "Any claim of excessive force is evaluated under the objective standard of 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Id. (quoting, Graham, 490 U.S. at 397.

In making the objectively reasonableness determination, the Court looks at "1) the severity of the crime, 2) whether the suspect poses an immediate threat to the safety of the officer or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." Ciminillo v. Streicher, 434 F.3d 461, 467 (6th Cir. 2006). These factors are not exhaustive, however, because,

> the ultimate question is "whether the totality of the circumstances justifies a particular sort of seizure." St. John v. Hickey, 411 F.3d 762, 771 (6th Cir. 2005) (quoting Graham, 490 U.S. at 396). Furthermore, reasonableness must be judged from the perspective of a reasonable officer on the scene, not with the 20/20 vision of hindsight. See Terry v. Ohio, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir. 2002).

Id.

"Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness," and "the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994). Thus, while a "court may be hesitant to doubt [an officer's] testimony . . . 'the court may not simply accept what may be a self-serving account by the police officer," but "must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" Jefferson v. Lewis, 595 F.3d

454, 462 (6th Cir. 2010) (citing Id).  This includes looking at "contemporaneous statements by the officers," and consideration of "whether officer's story is internally consistent and consistent with other known facts.'" Scott, 39 F.3d at 915.

In this case, summary judgment is unwarranted if for no other reasons than the officers' own accounts[15] of the incidents are inconsistent, both individually and collectively.  This is best exemplified by comparing the incident reports which were filed shortly after the incident, with the depositions taken in this case.  For example, in the incident reports filed by two of the officers, they claimed that Mr. Eibel opened fire before he was shot.  Even Deputy Mackie – the one that fired the fatal shots – claimed that he heard a gunshot, leaving him no choice to return fire.  Obviously, this brings those officers' credibility into question since it now turns out that Mr. Eibel did not fire a weapon at the officers.

Incident reports to the side, the deposition testimony that has been proffered fails to establish as a matter of fact that Mr. Eibel was posing a threat to the officers at the time of the fatal shooting.  Were it clear that Mr. Eibel was aiming his gun at the officers, the answer would be easy because "[w]hen a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death." Greathouse, 433 Fed. App'x at 373.[16]  However, the evidence which has been presented is murkier.

Deputy Sidwell testified that Mr. Eibel was shot after he reached into the headboard and

___

[15] The Court notes that, throughout their briefs, the parties treat Defendants collectively.  Particularly with respect to this claim, that approach may be problematic because personal involvement is necessary to establish liability under Section 1983.  Heyerman v. County of Calhoun, 680 F.3d 642, 647 (6th Cir. 2012).  The Court will address this issue with counsel at the final pretrial conference.

[16] Contrary to counsel's assertion at oral argument that an officer must not shoot if he is able to jump to the side and take "a gut shot," "[a] police officer need not wait for a suspect to open fire on him, much less wait for the suspect to actually hit him, before the officer may fire back."  Id.

"swung out" a gun; Mackie testified the shooting occurred as Mr. Eibel was "coming around" with the weapon; and Deputy Tharp testified that the shooting occurred while Mr. Eibel was lying on his back with a gun in his hand. True, this testimony can be read as suggesting that Mr. Eibel did in fact pose a serious threat, but such a reading ignores that Defendants have admitted as a statement of undisputed fact that "[w]hen Deputy Mackie entered the bedroom, Mr. Eibel did not have possession of any weapon, and was reaching across his body," (Docket No. 49 at 17, SOF 53), and ignores Mackie's deposition testimony that Sidwell could have "jumped on Ron before he got his gun." (Docket No. 23-4, Mackie Depo. at 119). More importantly, it begs the ultimate question of whether Mackie fired because Mr. Eibel was actually posing a threat to him; because he mistakenly thought Mr. Eibel had fired at him already; or for some other reason unrelated to responding to the threat of imminent bodily harm, such as the anxiety that no doubt existed during the deployment of a CRU that was only recently formed.

Moreover, Mrs. Eibel testified that, at the time officers entered the house, Mr. Eibel was drunk and asleep in bed. A plausible inference to be drawn from this testimony is that Mr. Eibel was unlikely to pose a threat because he would have had to wake up, figure out what was going on, reach into the cabinet, retrieve his gun, and aim it at the officers.

Ultimately, this issue will be decided by the assessment of credibility, the weight of the evidence, and the legitimate inferences that can be drawn from the facts, all of which "are jury functions, not those of a judge." Anderson, 477 U.S. at 255 see, Hinojosa v. Butler, 547 F.3d 285, 294 (5th Cir. 2008) ("A review of the record, however, makes plain that the fate of [plaintiff's] excessive force claim turned on credibility; whether the jury believed that [defendant] used excessive force against [plaintiff] turned on the extent to which [defendant's] characterization of [plaintiff's] behavior, and the threat he posed, was credible"). As such, summary judgment will not

be granted on Plaintiff's excessive force claim arising from the shooting of Mr. Eibel.[17]

## F.  Post-Shooting Conduct

### 1.  *Failure to Render First Aid*

The Due Process Clause of the Fourteenth Amendment requires government officials to provide adequate medical care to individuals injured while apprehended by police.  Revere, 463 U.S. at 244.  The standard used in assessing such a claim is the same for both arrestees and convicted inmates: deliberate indifference.  Ford v. County of Traverse, 535 F.3d 483, 495 (6th Cir. 2008).

"A deliberate indifference claim has both objective and subjective components."  Alspaugh v. McConnell, 643 F.3d 162, 169 (6th Cir. 2011).  "The objective component requires a plaintiff to show that 'the medical need at issue is sufficiently serious,'" while "[t]he subjective component requires a showing that 'prison officials have a sufficiently culpable state of mind in denying medical care.'"  Id. (citations omitted).

Here, there can be no doubt that, upon being shot, Mr. Eibel had sufficiently serious medical needs, and Defendants do not argue otherwise.  Instead, they argue that they did not have a culpable state of mind because they promptly sought medical care, care which arrived within about five minutes.  In support of their position, Defendants rely on Rich v. City of Mayfield Heights, 955 F.2d 1092 (6th Cir. 1992).  Plaintiff does not cite, let alone discuss, Rich in her response.

In Rich, an officer found a prisoner hanging in his cell.  Rather than cut the prisoner down immediately, the officer ran out and summoned help.  Within a minute, the officer and paramedics returned and attended to the prisoner.

---

[17]  Insofar as Defendants assert that they are entitled to qualified immunity on this claim, the same is denied because "[i]t has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.'"  King v. Taylor, ___ F.3d ___, ___, 2012 WL 3968371 at * 10 (6th Cir. Sept. 12, 2012) (collecting cases)

Overruling the district court's denial of qualified immunity, the Sixth Circuit held that "[t]he police officers did not intentionally deny or delay [the prisoner's] access to medical care, and their actions certainly did not constitute the 'unnecessary and wanton infliction of pain' necessary to establish deliberate indifference to medical needs." Id. at 1098.   In arriving at its conclusion, the Sixth Circuit quoted the following from Maddox v. City of Los Angeles, 792 F.2d 1408 (9th Cir. 1986):

> The due process clause requires responsible governments and their agents to secure medical care for persons who have been injured while in police custody. . . . We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances. . . . Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital.

Rich, 955 F.2d 1097.  The court also noted the Eighth Circuit's holding in Tagstom v. Enockson, 857 F.2d 502, 503-04 (8th Cir. 1988) that an officer was not deliberately indifferent to an arrestee's/motorcyclist's medical needs where the officer "called for an ambulance . . . immediately upon seeing the accident and the ambulance arrived within six minutes or less." Id.

In light of subsequent Sixth Circuit cases, the Court is of the opinion that it would be a mistake to read Rich as holding that, in any and all circumstances, an officer need never do more than summon medical help in order to avoid being found deliberately indifferent to a serious medical need.

Consider, for example, Estate of Owensby v. City of Cincinnati, 414 F.3d 596 (6th Cir. 2005). There, Cincinnati police officers choked, hit, and maced a suspect who had eluded arrest in the past, and threw him into the back of a squad car. Arriving at the scene, another officer peered into the back of the cruiser where he saw that the suspect "was  bleeding and appeared unable to breathe,"

prompting the officer to say, "this looks f[-]ed up. Can he breathe? It don't look like he can from the way he's laying." Id. at 600. Nevertheless, all of the officers "failed to investigate [the suspect's] condition any further and did not attempt to provide him with medical care." Id.

In affirming the denial of qualified immunity, the Sixth Circuit "agree[d] with the district court's conclusion that the evidence – again, when viewed in the light most favorable to the estate – indicates that each officer did, in fact, know of and disregard the substantial risk of harm to [the suspect's] health and safety." Id. at 603. The court also rejected the officer's assertion that deliberate indifference could not be shown "because only about six minutes passed between the time [the suspect] was taken into custody and the time medical care was provided." Id. The court then wrote:

> [W]e note in summary that each officer viewed [the suspect] in significant physical distress, yet *made no attempt to summon or provide any medical care* until several minutes later, when [a Sergeant] checked on [the suspect] and discovered that he was not breathing. This evidence is sufficient to demonstrate that *each officer's failure to provide medical care* to [the suspect] constituted a violation of the Fourteenth Amendment.

Id. (emphasis added). This very passage has been quoted for the proposition that "Owensby involved not only the failure to summon medical care, but also the failure to provide medical care." Scozzari v. Miedzianowski, 454 Fed. App'x 455, 465-66 (6th Cir. 2012). Similarly, the Sixth Circuit in Hunt v. Sycamore Comty. Sch. Dist. Bd. of Educ. 542 F.3d 529 (6th Cir. 2008) characterized Owensby's holding as being "that there was evidence sufficient to survive summary judgment that the police violated the victim's Fourteenth Amendment right to medical care while in custody" where the facts indicated the police "beat a suspect after he had been subdued, then failed to give him medical attention while he lay in extremis[.]" Id. at 543.

The deputies in this case, of course, did not beat Mr. Eibel, but Deputy Mackie did shoot him

30

repeatedly, and a jury could determine that all of the officers were deliberately indifferent to his serious medical needs, notwithstanding that help was promptly summoned. While Sgt. Garrett testified in his deposition that the bleeding stopped once Mr. Eibel was on his back, Deputy Sidwell appears to have conceded in his deposition that Mr. Eibel continued to bleed after he was shot, and, despite the fact that he was still handcuffed, nobody bothered even to place pressure on the wound, although most, if not all of the officers had received at least rudimentary first aid training. (Docket No. 25-4, Sidwell Depo. at 114-115). If, as Plaintiff claims, Mr. Eibel was "bleeding out," and Defendants were aware of that situation but did nothing, a reasonable jury could conclude that Defendants were deliberately indifferent to his serious medical need in violation of the Fourteenth Amendment.

In deciding that this issue should be presented to the jury, the Court has considered Defendants' alternative argument that they are entitled to qualified immunity on Plaintiff's deliberate indifference claim. However, "[r]easonable officers would have known, based on this Circuit's precedent, that the obligation to provide adequate medical care to an injured detainee is not discharged merely by promptly calling for assistance[.]" <u>Scozzari</u>, 454 Fed. App'x at 466.[18]

### 2. Cover-up

Plaintiff alleges Defendants engaged in a "cover-up" after the shooting. The entirety of her

---

[18] The Court recognizes that the Sixth Circuit went on in <u>Scozzari</u> to say that the obligation to provide adequate medical care to an injured detainee "extends to ensuring that medical responders are able to access the victim without unreasonable delay." <u>Id</u>. The Court does not believe this to be the only thing a reasonable officer would have understood since the Sixth Circuit in <u>Scozzari</u> specifically relied on <u>Owenby</u> for the proposition that deliberate indifference can be shown not only by the failure to summon care, but also by the failure to provide medical care. Moreover, it is not necessary that "the very action in question has been previously held unlawful,'" because "an action's unlawfulness can be apparent from direct holding, from specific example described as prohibited, *or from the general reasoning that a court employs*." <u>Feathers v. Aey</u>, 319 F.3d 843, 848 (6th Cir. 2003) (citation omitted, emphasis added).

31

argument on this score is as follows:

> Defendants deny that they participated in any conduct to cover-up any constitutional violation. However, after the incident, which occurred in the bedroom of Plaintiff and Mr. Eibel, the CRU team was left in the CRU van for approximately two (2) hours. During these two (2) hours, logical reasoning and human nature tells us that the CRU team could have discussed at great length what "story" they would tell about what really happened in that bedroom. When Defendants were interviewed, they each gave their own story about what happened. However, if they were all telling the truth and not trying to cover up any of their actions, then they would have all told the same story. That is not the case. Each of their stories differed in detail about what happened with Mr. Eibel. This is enough to establish a question of fact for which a jury could decide.

(Docket No. 47 at 16).

Actually, its seems "logical reasoning and human nature" would lead one to conclude that, if Defendants were bent on "covering-up" the events of the shooting, they would have come up with the same story, not varying accounts. Regardless, even if Defendants spent the rest of the night together, that does not mean that they were conjuring up an explanation for the shooting, and Plaintiff has proffered not even a scintilla of evidence that such a conspiracy occurred.

"Conclusory, unsupported allegations of the deprivation of rights protected by the United States Constitution or federal laws are insufficient to state a claim," <u>Lanier v. Bryan</u>, 332 F.3d 999, 1007 (6th Cir. 2003). Plaintiff's "cover-up" claim will be dismissed.

## G. Arbitrary Action Which Shocks the Conscience

Among the "federal constitutional violations" identified by Plaintiff, she claims her husband was deprived of the "[f]reedom from arbitrary governmental activity which shocks the conscience of a civilized society." (Docket No. 1, Complaint ¶ 79(f)). In the briefing, the parties treat this as a self-standing claim, and, to the extent it is intended as such, dismissal is warranted.

"'Arbitrary action' . . . is used in a constitutional sense, which encompasses 'only the most

32

egregious official conduct,' namely that which 'shocks the conscience.'"  Slaughter v. Mayor & City Council of Baltimore, 682 F.3d 317, 321 (4th Cir. 2012) (quoting, County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).  "Defining conduct that shocks the conscience does not draw on any traditional standard of liability from tort law but rather refers, as a constitutional construct of substantive due process, to 'conduct intended to injure in some way unjustifiable by any government interest.'"  Id.

In Graham, the Supreme Court made "explicit what was implicit in Garner's analysis, and h[e]ld that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  Graham, 490 U.S. 386, 395 (emphasis in original).  "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."  Id.; see, Wilson v. Wilkins, 362 Fed. App'x 440, 443 (6th Cir. 2010) (citation omitted) ("Given the explicit protections afforded by the Fourth Amendment, a plaintiff cannot 'also proceed with a claim under the 'more generalized notion of substantive due process.'").

## H.  Municipal Liability

Plaintiffs sue the Defendants in both their individual and official capacities.  Claims against local officers in their official capacities are essentially suits against the governmental entity that employs them, see, Everson v. Leis, 556 F.3d 484, 493 n.3 (6th Cir. 2009), and Defendants seek dismissal of all of Plaintiff's municipal liability claims.

33

In  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  However, "municipalities may be held liable under § 1983 when the injury inflicted is a result of 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'"  Radavansky v. City of Olmstead Falls, 395 F.3d 291, 311 (6th Cir. 2005) (quoting, Monell, 436 U.S. at 694)).

In response to Defendant's Motion for Summary Judgment, Plaintiff argues that because the employee manual of the Overton County Sheriff Office states that the department's function is to "protect life, liberty and property," "safeguard lives," and "respect the constitutional rights of all," Defendants violated that policy by killing Mr. Eibel.  However, "Monell's rule [is] that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation[.]" City of Canton v. Harris, 489 U.S. 378. 390 (1989); see, Polk County v. Dodson, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (municipal policy must be "moving force" behind constitutional deprivation). Obviously, the department "policy" to protect life and limb, and to respect the constitution, cannot be said to have constituted the alleged constitutional violation in this case.

Likewise, Plaintiff's claim that the officers, by using hollow point ammunition, violated Overton County's policy that officers only be issued "basic ammunition" can not serve as the basis for municipal liability because requiring officers to use only "basic ammunition" was not the driving force behind the alleged constitutional deprivation.  Russell v. Hennepin County, 420 F.3d 841, 848 (8th Cir. 2005) (no municipal liability where violation "resulted not from the execution of [county] policy but from the failure to assiduously follow the policy"); Walker v. Shaw, 2010 WL 2541711

34

at *7 (S.D.N.Y. June 23, 2010) ("failure to follow a policy . . . is the antthesis of a link between policy and action"). Additionally, Plaintiff cites no cases which hold that the use of hollow ammunition is, perforce, a constitutional violation.

Plaintiff also seeks to hold Overton County liable because Deputy Mackie had engaged in unlawful conduct in the past, and because no Defendant was "disciplined in any way for taking the life of Mr. Ronald Eibel." (Docket No 47 at 24).[19]

With regard to the former assertion, "'[e]ven assuming . . . that proof of a single instance of inadequate screening could ever trigger municipal liability,'" for there to be liability, a employee's past record must show that "'use of excessive force would be a plainly obvious consequence of the hiring decision.'" Howard v. Smith County, 2011 WL 4361486 (M.D. Tenn. 2011) (quoting, Bd. of County Comm'rs v. Byran County, 520 U.S. 397, 413–14, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). Plaintiff has not shown it would have been "plainly obvious" to Overton County that Deputy Mackie would engage in the sort of excessive force alleged in this case. As for the latter contention that none of the Defendants were disciplined for shooting Mr. Eibel, that could not have been a moving force in the deprivation because any such failure occurred after the shooting.

Finally, Plaintiff alleges that Overton County had a "policy" of failing to train its deputies. "The courts recognize a systematic failure to train police officers adequately as custom or policy

---

[19] In response to Defendants' interrogatory request that Plaintiff identify any facts which support the contention that the Sheriff failed to properly discipline officers and that officers knowingly engaged in unconstitutional behavior, Plaintiff replied, "I do not have any personal knowledge about this matter but my attorney has made an investigation," and "[m]y attorney and I have discussed the nature of rumors in Overton County about the violence that occurs from Sheriff W.B. Melton and his deputies." (Docket No. 29 at 49). Rumors and subjective beliefs are insufficient to defeat a motion for summary judgment. Harris v. Butler County, 344 Fed. Appx. 195, 200 (6th Cir. 2009).

35

which can lead to city liability." Gregory v. City of Louisville, 444 F.3d 725, 753 (6th Cir. 2006). However, "[t]he inadequacy of police training only serves as a basis for § 1983 liability 'where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" Miller v. Sanilac County, 606 F.3d 240, 255 (6th Cir. 2010) (quoting, Slusher v. Carson, 540 F.3d 449, 457 (6th Cir.2008)). "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005).

In this case, Plaintiff relies exclusively on a declaration from her expert, Larry P. Danaher, for her failure to train claim. In that declaration, Mr. Danaher makes general statements about "key components that are involved in every policy citizen contacts [sic]," claims that the utilization of a CRU team was not necessary, contends that the CRU did not properly devise a plan, asserts that the team's training fell "grossly" short, and makes the observation that "[j]ust because you dress up like a S.W.AT. [sic] team and have all of the gear that makes up [a] S.W.A.T. team does not give you the license that you have the capabilities to perform S.W.A.T. activities." (Docket No. 23-11, Danaher Decl. at 4). This is insufficient to submit the failure to train claim to a jury because Mr. Danaher's observations say nothing about prior instances of alleged unconstitutional conduct, let alone a history that would have placed Overton County on notice its CRU team's training was deficient. Moreover, this Court has already found that utilizing the CRU in this case did not amount to a constitutional deprivation, and a "county cannot be liable under § 1983 absent an underlying constitutional violation by its officers." Blackmore v. Kalamazoo County, 390 F.3d 890, 900 (6th Cir. 2004).

## I. **Negligence**

Defendants move for summary judgment on Plaintiff's negligence claim, arguing that they are immune from suit both under the common law and the Tennessee Governmental Tort Liability Act ("TGTLA" or "GTLA"), Tenn. Code Ann. § 29-20-201 *et seq*. Plaintiff's only response is to quote at length from the Tennessee Supreme Court's decision in Ezell v. Cockrell, 902 S.W.2d 394 (Tenn. 1995), and assert that the negligence claim should be presented to the jury because Defendants' actions were "reckless."

Ezell "held that the common law doctrine of public duty and its exception, the special duty doctrine, survived the enactment of the GTLA," but, in doing so, specifically declined to address the interplay between that doctrine and the GTLA. Chase v. City of Memphis, 971 S.W.2d 380, 385 (Tenn. 1998). The interplay was addressed in Chase, where the Tennessee Supreme Court held:

> The special duty exception to the public duty doctrine is applicable only when immunity has been removed under the GTLA. The special duty exception does not create liability but negates the public duty doctrine, a defense to liability. Accordingly, unless immunity has been removed by the GTLA, a plaintiff cannot recover damages against a government entity even if the special duty exception to the public duty doctrine is applicable.

Id. In other words, "if a governmental entity is immune under the GTLA, then the public duty doctrine and its exceptions are not relevant because they '[have] no effect on and cannot remove immunity afforded by the GTLA.'" Karnes v. Madison County, 2010 WL 3716458 at *6 (Tenn. Ct. App. Sept. 23, 2010) (citation omitted). "'Consequently, where both the statutory and common law defenses are raised, it is generally true that the first question to be addressed in a negligence action against a local government is whether that government is immune from liability under the GTLA.'" Id.

"The TGTLA removes immunity for 'injury proximately caused by a negligent act or omission

37

of any employee within the scope of his employment,' but provides a list of exceptions to this removal

of immunity." Johnson v. City of Memphis, 617 F.3d 864, 872 (6th Cir. 2010) (quoting, Tenn. Code

Ann. § 29-20-205)). "Injuries that "arise[ ] out of ... civil rights" are one such exception, that is,

sovereign immunity continues to apply in those circumstances." Id. Tennessee courts construe "'civil

rights' under section 29-20-205 as including claims arising under 42 U.S.C. § 1983 and the United

States Constitution, id., and a "negligence claim falls within this exception where 'the same

circumstances giv[e] rise" to both the negligence and civil rights claims.'" Partee v. City of Memphis,

449 Fed. App'x 444, 448 (6th Cir. 2011) (citing Id.).

Here, the circumstances that give rise to Plaintiff's civil rights claims also give rise to her

negligence claim. As such, the Court finds that Defendants are entitled to immunity, and summary

judgment will be granted on Plaintiff's negligence claim.

## V. CONCLUSION

On the basis of the foregoing, Plaintiff's Motion for Summary Judgment will be denied.

Defendants' Motion for Summary Judgment will be granted with respect to all of Plaintiff's claims,

except her claim that Defendants subjected Mr. Eibel to excessive force and were deliberately

indifferent to his serious medical needs.

An appropriate Order will be entered.

Kevin H. Sharp

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

38